COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-387-CV

JOHN L. HAWKINS AND 

RISCHON DEVELOPMENT CORP. APPELLANTS

V.

RON WALKER AND MARLA WALKER APPELLEES

------------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I. Introduction

Rischon Development Corporation and John L. Hawkins (collectively, appellants) appeal the trial court’s August 15, 2005 judgment for Ron and Marla Walker.  In addition, appellants attempt to appeal a November 13, 2006 order denying their post-judgment motion to recuse the trial judge.  We affirm the trial court’s August 2005 judgment in part and reverse and render in part.  We dismiss appellants’ appeal of the order denying their motion to recuse for want of jurisdiction.

II. Background Facts and Procedural History

On April 19, 2001, the Walkers bought lot 30 of the Sapphire Enclave subdivision in Colleyville, Texas from Rischon for $95,000.  The Sapphire Enclave consisted of thirty-two lots, which Rischon was developing.  Hawkins was Rischon’s president.  At the time of the purchase, Ron Walker owned Ron Walker Custom Homes, Inc.  He had been in the custom home building business for over twenty years and had built between 300 and 400 houses.  The Walkers planned to construct a “spec house” on the lot that they would live in while the home was on the market.  

Ron had first heard of the Sapphire Enclave sometime in 2000.  He was impressed by the brochure advertising the subdivision, which stated that it was to be a gated community.  Later, Ron received a copy of the Sapphire Enclave building restrictions and homeowner’s association covenants,
(footnote: 1) which Hawkins had drafted.  Before the Walkers purchased their lot, Ron and Hawkins talked often about the subdivision and Hawkins’s plans for it.  According to Ron, Hawkins made numerous representations to him, both before and after the Walkers purchased their lot and began building their house.  Ron testified that he relied on these representations in deciding to purchase the Walkers’ lot and in building a 5000-plus square-foot house that was valued (preconstruction) at $896,000. 

After closing on their lot in April 2001, the Walkers began construction on their house.  A month or six weeks later, no other homes were under construction, and no other lots had been sold.  In the summer of 2001, Hawkins told Ron that he was considering selling the remaining lots in the Sapphire Enclave to Pulte Homes and letting Pulte finish the subdivision.  By this time, the Walkers had already finished the outside of their home and had ordered custom items such as trim molding and cabinets.  Ron was concerned that the Walkers’ home would be too expensive to be competitive with the lower-priced homes that Pulte would build.  He was also concerned because the promised gate and perimeter fence had not been constructed and the subdivision was overgrown with weeds three to four feet tall.  Consequently, the Walkers decided to delay finishing their house until they could see what type and price ranges of houses would be built around theirs. 

Ron also asked Hawkins to approve variances from the Covenants for the Walkers’ home that would reduce construction costs, such as substituting a heavy-duty composite roof for a slate one, a six-foot fence for an eight-foot one, and aluminum windows for wood windows on the back of the house.  Hawkins verbally approved these requests.  In addition, in violation of the Covenants and without Hawkins’s approval, the Walkers used cedar siding on part of the house and some nonconforming doors and shutters.  They also did not install roof down spout drains hidden within the house’s exterior walls, as required by the Covenants.  As a result of these cost-saving measures, the Walkers’ total cost in their finished house was $732,199. 

In early 2002, Rischon revoked the Covenants and sold the remaining thirty-one lots in the Sapphire Enclave to Pulte.  Pulte cleaned up the subdivision and began building other homes.  Pulte put up a sign advertising the homes as starting at $300,000 to $400,000. 

In early January 2003, the Walkers consented to Rischon’s revocation of the Covenants.  On January 23, 2003, the Walkers sold their house for $490,000.  Shirley McLemore, a real estate agent with more than twenty years’ experience who had worked with the Walkers on the design and layout of their house, testified at trial that the Walkers’ house should have sold for $850,000 to $900,000, but it did not because no homes of similar value were built in the Sapphire Enclave.  McLemore further testified that potential buyers did not like the subdivision because the Walkers’ home was the only one under construction, and people were concerned that the surrounding lots, as well as the subdivision entrance, were unkempt and covered in tall weeds. 

Meanwhile, in December 2001, the Walkers sued appellants,
(footnote: 2) alleging causes of action for statutory fraud under business and commerce code section 27.01, common law fraud, and negligent misrepresentations.  The Walkers also sought declaratory relief and statutory damages from Rischon for its alleged invalid revocation of the Covenants under property code section 202.004.  

Rischon counterclaimed for a declaratory judgment that the Covenants were revocable and properly revoked by Rischon, and that the Walkers had not complied with the Covenants and, therefore, could not enforce them.  Rischon sought actual damages and attorney’s fees.

In August 2004, the trial court granted the Walkers summary judgment on their claim that Rischon’s revocation of the Covenants was invalid.  In September and October 2004, the remainder of the case was tried to a jury.  The jury found that appellants had not committed common law fraud, but had committed statutory fraud and negligent misrepresentations, resulting in damages to the Walkers of $242,199.  The jury also found that $25,000 in exemplary damages should be assessed against both Rischon and Hawkins and that the Walkers’ reasonable and necessary attorney’s fees were as follows: $45,000 through trial, $25,000 if the case was appealed to this court, $15,000 if a petition for review is filed in the Supreme Court of Texas, and $15,000 if the petition is granted. 

As to Rischon’s counterclaim for declaratory judgment, the jury found that the Walkers had failed to comply with three out of eight Covenants without Hawkins’s approval
(footnote: 3) but that Rischon had not suffered any damages or incurred any attorney’s fees as a result of the noncompliance.

The trial court rendered judgment on the verdict and awarded the Walkers $242,199 in actual damages against appellants, jointly and severally, pre- and post-judgment interest, $25,000 in punitive damages against Hawkins, $25,000 in punitive damages against Rischon, and attorney’s fees in the amounts found by the jury.  The trial court also awarded the Walkers $68,600 in statutory damages against Rischon under section 202.004 of the property code, less a settlement credit of $45,000.  The trial court did not award Rischon any damages or attorney’s fees on its counterclaim against the Walkers, but it recited that the Walkers had “failed to comply with the restrictive covenants at issue without justification as to the wood siding, wooden doors, and shutters on the residence.” 

After this appeal was filed in this court, the Walkers contested appellants’ affidavits of net worth filed to support their supersedeas bond, as permitted by appellate rule 24.
(footnote: 4)  Following a hearing on the supersedeas bond issue held on October 17, 2006, appellants filed a motion to recuse the trial judge, the Honorable David Evans, alleging that Judge Evans’s conduct at the October 17 hearing called his impartiality into question and violated the code of judicial conduct.  In response, the Walkers asserted that the motion to recuse was groundless and moved for sanctions against appellants.  In accordance with procedural rule 18a, Judge Evans forwarded the recusal matter to the Honorable Jeff Walker, the presiding judge of the Eighth Administrative Judicial Region of Texas.
(footnote: 5)  After a hearing, Judge Walker denied the motion to recuse and assessed sanctions against appellants.  Appellants are now attempting to appeal the order denying their motion to recuse.  The supersedeas issue remains pending in the trial court.
(footnote: 6)   

III. Property Code Section 202.004

In their first issue, appellants complain that the trial court improperly rendered judgment awarding the Walkers damages from Rischon under property code section 202.004 based on Rischon’s invalid revocation of the Covenants, because the Walkers, as private landowners, are not entitled to relief under this statute.  
Section 202.004 of the property code, which is entitled “Enforcement of Restrictive Covenants,” provides that “[a] property owners’ association or other representative designated by an owner of real property may initiate, defend, or intervene in litigation . . . affecting the enforcement of a restrictive covenant or the protection, preservation, or operation of the property covered by the dedicatory instrument.”
(footnote: 7)  A property owners’ association is “an incorporated or unincorporated association owned by or whose members consist primarily of the owners of the property covered by the dedicatory instrument and through which the owners . . . manage or regulate the residential subdivision.”
(footnote: 8)   In a suit brought under section 202.004, a court may assess civil damages for the violation of a restrictive covenant in an amount not to exceed $200 for each day of the violation.
(footnote: 9)
 The Walkers contend that appellants have waived their complaint that the  Walkers are not entitled to recover under section 202.004 because they did not object when the Walkers asked the trial court to instruct the jury of the court’s summary judgment ruling that Rischon’s revocation of the Covenants was invalid.  We disagree.  Appellants argued in their motion for judgment notwithstanding the verdict that the Walkers could not recover statutory damages under section 202.004 because the statute applies only to homeowners’ associations or owners’ representatives and cannot benefit private landowners.  A challenge to the availability of a statutory remedy in a post-verdict motion is sufficient to preserve the complaint for appellate review.
(footnote: 10)  Accordingly, appellants have preserved this complaint for our review, and we will address it.

In construing section 202.004 to determine whether the Walkers have standing to recover against Rischon as private landowners, our goal is to give effect to the legislature’s intent.
(footnote: 11)  Unless a statute is ambiguous,
(footnote: 12) we discern that intent from the language of the statute itself.
(footnote: 13)  A statutory provision will not be construed to lead to an absurd result if the provision is subject to another more reasonable interpretation.
(footnote: 14) Further, we consider the provisions of a statute as a whole and not in isolation.
(footnote: 15)
 Section 202.004 expressly provides that a “property owners’ association or other representative designated by an owner of real property” may sue to enforce a restrictive covenant or to protect property covered by a restrictive covenant.
(footnote: 16)  This exclusive language evidences a legislative intent that only property owners’ associations or the designated representative of a property owner may sue for civil damages under the statute.  Individual property owners are not identified in the statute as persons or entities who are authorized to bring suit under the statute.
(footnote: 17)  

In this case, the Walkers are not, and do not purport to be, a property owners’ association as that term is statutorily defined.  Nor is there any evidence in the record showing that they are designated representatives of the property owners in the Sapphire Enclave.
(footnote: 18)  Instead, they sued Rischon in their individual capacities.  Because section 202.004 does not authorize the Walkers  to sue and recover damages in their individual capacity, they are not entitled to recover from Rischon under the statute.  Therefore, we sustain appellants’ first issue.
(footnote: 19)
IV. Statutory Fraud

In their tenth, twelfth, and fourteenth issues, appellants challenge the legal and factual sufficiency of the evidence to support the jury’s statutory fraud findings under section 27.01 of the business and commerce code.

A. Standards of Review

A legal sufficiency challenge may be sustained only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.
(footnote: 20)  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
(footnote: 21)  
Anything more than a scintilla of evidence is legally sufficient to support the finding.
(footnote: 22)  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.
(footnote: 23)
 An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.
(footnote: 24)  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.
(footnote: 25)
B. Elements of Statutory Fraud

A plaintiff may recover for statutory fraud in a real estate transaction under section 27.01 of the business and commerce code by establishing the following: (1) the defendant made a false, material promise to do an act, (2) with the intention of not fulfilling it, (3) for the purpose of inducing the plaintiff to enter into a contract, and (4) the plaintiff relied on the promise in entering into the contract.
(footnote: 26)  A plaintiff who proves these elements is entitled to recover from the defendant actual and exemplary damages.
(footnote: 27) 

Although a party’s intent to defraud is determined at the time the party made the representation, it may be inferred from the party’s subsequent acts following the representation.
(footnote: 28)  Failure to perform, standing alone, is not sufficient evidence of the promisor’s intent not to perform when the promise was made.
(footnote: 29)  That fact is, however, a circumstance to be considered with other facts to establish intent.
(footnote: 30)  Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony.
(footnote: 31)  “Slight circumstantial evidence” of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent.
(footnote: 32)
 An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud.
(footnote: 33)  Whether a statement is an actionable statement of “fact” or merely one of “opinion” often depends on the circumstances in which the statement is made.
(footnote: 34)  Among the relevant circumstances are the statement’s specificity, the comparative levels of the speaker’s and the hearer’s knowledge, and whether the statement relates to the present or the future.
(footnote: 35)  

A person who makes a misrepresentation is liable to the person or class of persons the maker intends or has reason to expect will act in reliance upon the misrepresentation.
(footnote: 36)  If a defendant makes a misrepresentation about property to a potential buyer in the presence of a third party and the third party later acts on the misrepresentation to his detriment, the defendant is not liable to the third party for fraud unless he intended to deceive the third party or knew there was an “especial likelihood” that his representation would influence the third party’s conduct.
(footnote: 37)
 Texas recognizes two measures of direct damages for fraud: the out-of-pocket measure and the benefit-of-the-bargain measure.
(footnote: 38)  The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received.
(footnote: 39)  
Both of these measures of damages are determined at the time of sale.
(footnote: 40)  In addition, to these damages, however, the defrauded party is entitled to recover special damages for other pecuniary losses proximately caused by the misrepresentation.
(footnote: 41)
 1. Hawkins Made False Promises to Act with the Intention of Not Fulfilling Them to Induce the Walkers to Purchase the Lot and Build their Home in Sapphire Enclave
 

Ron testified that Hawkins made the following representations regarding development of the Sapphire Enclave:

•The subdivision would feature only “world class” architecture. 

•Only “preferred” builders from Southlake and Colleyville—including Ron Walker—would be permitted to build in the subdivision.  Their names and telephone numbers were listed on a sign located at the front of the subdivision.  

•Homes in the Sapphire Enclave would be priced starting at $700,000, as stated on a sign at the entrance to the subdivision. 

•The subdivision entrance would be completed as represented in the brochure that the Walkers had received, with neutral-colored brick columns and wrought iron. 

•A fence would be constructed around the perimeter of the subdivision so that it would be truly “gated.” 

•Hawkins would stay with the subdivision for as long as possible to make it successful.  

The evidence shows that all but the first of these representations constitute false material promises to act that Hawkins made for the purpose of inducing the Walkers to purchase the lot and build their home in the Sapphire Enclave.

Ron testified that Hawkins specifically told him—both before and after the Walkers bought their lot—that the subdivision entrance would be completed as represented in the brochure that the Walkers had received, with neutral-colored brick columns, wrought iron work, and completed landscaping, and that a fence would be constructed around the entire perimeter of the subdivision so that it would be truly “gated.”  Hawkins said work on the entrance and the perimeter fencing would begin “immediately,” as soon as the Walkers closed on their property.  Hawkins told Ron about another subdivision in Keller that Hawkins just had begun developing and suggested that Ron look at it.  Ron went and looked at that subdivision and saw that it was “very nice.”  The Keller subdivision had a perimeter wrought iron fence all the way around it, and the gate and landscaping were completely finished.  

Hawkins did not begin work immediately on the promised gate and perimeter fence, and the gate eventually completed was not as represented.  Instead of the promised neutral-colored brick columns and wrought iron work, Hawkins had stucco arches put up that were an “orangy pinkish” color.  McLemore, the Walkers’ realtor, testified that the neutral color depicted in appellants’ brochure was common in Colleyville subdivisions but that the orangy pinkish color appellants actually used was not, and her clients commented about it.  McLemore further testified that, when she asked Hawkins if the color could be changed, he responded that it “had been in his plan to have it that color and . . . that he thought it was very pleasing.”
(footnote: 42)    

In addition, McLemore testified that only a few flowers were planted by the entrance, rather than the trees, shrubs, and extensive landscaping depicted in the brochure; the entrance area was weedy and looked like it was not being cared for; part of the gate was not constructed for a long time; and the wrought iron fencing was not in place.  Indeed, appellants never had the fence constructed; Pulte built the fence after Pulte purchased the property in 2002.
(footnote: 43)   The evidence further shows that the names and phone numbers of the “preferred” builders whom Hawkins had represented would be allowed to build in the Sapphire Enclave were listed on a sign at the front of the subdivision.  The $700,000-plus price range for the homes that were to be built was also shown on the sign.  

Hawkins testified, however, that none of these builders except Walker had committed to building homes in Sapphire Enclave at the time Hawkins put their names on the sign, and that all but the Walkers’ lot had been sold to Pulte, which was not on the preferred builders’ list and built homes priced much lower than $700,000.  The builders simply allowed Hawkins to use their names and telephone numbers in an attempt to generate business in the subdivision.  Moreover, nothing in the Covenants that Hawkins drafted allowed appellants to control which builders would build homes in Sapphire Enclave.  

Ron testified that, when he asked Hawkins about his long-range plan for the Sapphire Enclave in case the lots did not sell quickly, Hawkins assured him that he was prepared to stay with the subdivision as long as possible to get it going and make it successful.  Hawkins reiterated this assurance before the Walkers closed on their lot, in response to Ron’s expressed concern regarding the lack of closings or contracts on other lots.  Hawkins, however, began talking to Pulte about selling the Sapphire Enclave in the summer of 2001, only three or four months after the Walkers had closed on their lot and begun work on their house.    

Appellants contend that they did not know until the Walkers closed on their lot that the Walkers, rather than Ron’s company, would be purchasing the lot; therefore, appellants had no reason to expect that the Walkers would rely on appellants’ representations and thus did not intend to defraud them individually.  Ron acknowledged that the Walkers did not tell appellants until the closing on their lot that they, rather than Ron Walker Custom Homes, Inc., would be purchasing the lot.  Hawkins knew, however, that Ron was interested in purchasing a lot in the Sapphire Enclave in some capacity and building a custom home on it, and Hawkins made the representations about the subdivision directly to Ron in order to influence his decision.  Moreover, Marla testified that, before the Walkers bought their lot, Hawkins and his wife took the Walkers and Gerri Lowry, Rischon’s selling agent, to dinner.  Marla testified they talked about the subdivision at dinner and that “everyone was real excited.” 

2.  The Walkers Relied on Hawkins’s False Promises

Ron testified that, at the time the Walkers purchased their lot, he had been building custom homes for over twenty years and had built between 300 and 400 houses.  He said that he relied on Hawkins’s representations regarding the “preferred” builders list and the $700,000-plus price range in deciding to purchase the Walkers’ lot and build a home with an estimated preconstruction value of $896,000. 

Appellants contend that Ron did not reasonably rely on Hawkins’s representation that only preferred builders would build homes in the Sapphire Enclave because the Walkers contracted with Joe Willingham, who was not on the preferred builders list, to build the Walkers’ home.  Ron testified, however, that Willingham was Marla’s father and that his designation as the Walkers’ builder on their loan construction agreement was a mere formality suggested by the Walkers’ banker.  Ron testified that he, not Willingham, built the Walkers’ home.     

3. The Walkers were Damaged by Appellants’ Misrepresentation

Appellants also challenge the sufficiency of the evidence to support the jury’s finding of $242,199 in actual damages on the Walkers’ statutory fraud claim.  Appellants argue that the Walkers could recover damages based only on the value of their lot at the time they bought it from appellants—not based on the sale price of their completed home—and that there is legally and factually insufficient evidence of the value of the lot.  Appellants further contend that there is no evidence supporting the damages award because the evidence does not show that the sale price of the Walkers’ completed home was impacted by appellants’ failure to perform as represented. 

The evidence shows that, in reliance on appellants’ misrepresentations regarding how the Sapphire Enclave would be developed, the Walkers decided to build a home on their lot that was valued, before construction, at just over $896,000.
(footnote: 44)  Ron testified that, subsequently, when no other lots in the Sapphire Enclave had sold and he learned that appellants were considering selling the subdivision to Pulte, he obtained approval from Hawkins to make some substitutions in building materials that reduced the Walkers’ construction costs in the home.  Ron also admitted that he made other modifications without Hawkins’s prior consent.  Even with these modifications, however, the Walkers’ total cost to complete their home was $732,199.

In January 2003, the Walkers sold their house for $490,000.  McLemore, the Walkers’ real estate agent, who had more than twenty years’ real estate experience in the Colleyville area, testified that the Walkers’ house should have sold for $850,000 to $900,000, but it did not because no homes of similar value were built in the Sapphire Enclave.  McLemore further testified that potential buyers did not like the color of the entrance to the subdivision.  She also testified that potential buyers did not like subdivision itself because the Walkers’ home was the only one under construction and the surrounding lots, as well as the subdivision entrance, were unkempt and covered in tall weeds.  Ron testified that, based on the representations Hawkins had made to him when he bought the lot, the Walkers’ house, as it was eventually completed, should have sold for “[i]n the mid 800 range.”
(footnote: 45)  He further testified, however, that he was seeking damages only for the difference between the sale price of the house and his cost to build it. 

In summary, the evidence shows that the Walkers built the home that they did in reliance on appellants’ representations regarding how the Sapphire Enclave would be developed and that the sale price of the Walkers’ home was directly impacted by appellants’ failure to perform as represented to Ron.  The jury found that the Walkers suffered $242,199 in damages as a result of appellants’ fraud, which was the difference between the sale price of the Walkers’ house and their cost to complete it.  In a fraud case, “[s]pecial damages may be recovered for losses on improvements to property purchased as a result of misrepresentation.”
(footnote: 46)  Accordingly, we hold that the evidence is legally and factually sufficient to support the jury’s damages finding.  

Based on the foregoing, we overrule appellants’ tenth, twelfth, and fourteenth issues.
(footnote: 47)
C.  Statute of Frauds

In their thirteenth issue, appellants contend that the Walkers’ statutory fraud claim is barred by the statute of frauds.
(footnote: 48)  We disagree.  A fraud claim is barred by the statute of frauds only when the plaintiff seeks to obtain the benefit of the bargain that he would have obtained had the defendant’s promise been performed.
(footnote: 49)  In this case, the Walkers did not seek by their fraud claim to obtain the benefit of an alleged bargain between themselves and appellants.  Indeed, as appellants point out, the trial court noted that the Walkers were not seeking “expectation damages,” i.e., damages for the benefit of a bargain with appellants.
(footnote: 50)  
Therefore, the statute of frauds does not apply to their fraud claim.  We overrule appellants’ thirteenth issue.

V. Attorney’s Fees

A. Attorney’s Fees Through Trial

In their twentieth issue, appellants challenge the legal and factual sufficiency of the evidence to support the jury’s finding that reasonable and necessary attorney’s fees for preparation and trial of the Walkers’ case were $45,000.  A person who violates section 27.01 by committing statutory fraud “shall be liable to the person defrauded for reasonable and necessary attorney’s fees”;
(footnote: 51) therefore, the Walkers are entitled to recover reasonable attorney’s fees from appellants on their statutory fraud claim.  Accordingly, we will consider whether the evidence is sufficient to support the jury’s finding.

The party seeking to recover attorney’s fees bears the burden of proving that they are reasonable and necessary.
(footnote: 52)  Factors that the factfinder should consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.
(footnote: 53)  The party seeking to recover attorney’s fees is not required to present evidence on all of these factors.
(footnote: 54)  Evidence of a fee agreement is insufficient, by itself, to support a fee award.
(footnote: 55)  But evidence from an expert witness that the fee arrangement at issue was the reasonable or usual and customary fee for the type of litigation involved provides an evidentiary foundation upon which the factfinder can calculate the award.
(footnote: 56)
 In this case, the Walkers’ attorney, Cecil Miskin, testified that he had been the Walkers’ attorney for over fifteen years.  Miskin testified that he and the Walkers had entered into a fee agreement under which the Walkers agreed to pay a flat $15,000 fee for each of three stages of the case: (1) the preliminary investigation and attempted negotiations with appellants, (2) preparation for trial, and (3) trial of the case to judgment.  Miskin testified that he had spent time reviewing the documents that the Walkers provided when they asked him to take their case, handling the initial investigation of the case, writing a series of letters to Hawkins, corresponding with appellants’ attorney, obtaining and reviewing “a very significant quantity” of discovery materials, deposing Hawkins, defending the Walkers’ depositions, and responding to a long series of summary judgment motions that were brought primarily by appellants.  The record shows that the trial itself lasted three days.  Miskin opined that his fees were very reasonable for an attorney of his skills and education.
(footnote: 57)  He testified that he did not keep time records, but he estimated that he had spent well in excess of 200 hours working on the case and testified that his hourly rate was $350 per hour.
(footnote: 58)
 Miskin acknowledged that some of the work he had performed on the case had pertained to the Walkers’ lawsuit against Pulte, which had settled before trial.  This included preparing and filing an amended pleading, taking a small deposition, preparing and responding to correspondence between counsel, and negotiating a settlement agreement between the Walkers and Pulte.  Miskin testified, however, that this work was inextricably intertwined with and “substantially less” than the work he had performed related to the Walkers’ suit against appellants. 

Although appellants’ counsel had the opportunity to cross-examine Miskin and to present other witnesses, Miskin’s testimony was uncontroverted.  Therefore, the jury was entitled to accept it as true.
(footnote: 59)
 Having carefully considered the evidence regarding the reasonableness of Miskin’s attorney’s fees and the lack of controverting evidence, we hold that the evidence is legally and factually sufficient to support the award of $45,000 in attorney’s fees for preparation and trial of the Walkers’ case.  Accordingly, we overrule appellants’ twentieth issue.

B.  Segregation of Fees

In their sixth through eighth issues, appellants contend that the Walkers cannot recover attorney’s fees on their claim that appellants improperly revoked the Covenants.  Ordinarily, a party seeking to recover attorney’s fees is required to segregate fees between claims for which he can recover attorney’s fees from claims for which he cannot.
(footnote: 60)  Appellants did not, however, timely object to the trial court’s submission of a broad attorney’s fees issue to the jury, which asked, “What is a reasonable fee for the necessary services of [the Walkers’] attorney in this case . . . [f]or preparation and trial”?  Therefore, although we have reversed the trial court’s judgment for the Walkers on the improper revocation claim, appellants have waived their right to complain on appeal that the Walkers must segregate the attorney’s fees awarded between that claim and their statutory fraud claim.
(footnote: 61) Although appellants objected to the failure to segregate in their post-verdict and post-judgment motions, these objections came too late to preserve this complaint for our review.
(footnote: 62)  Therefore, we overrule appellants’ sixth through eighth issues.

C.  Appellate Attorney’s Fees

The jury also awarded the Walkers the following appellate attorney’s fees: $25,000 if the case was appealed to this court, $15,000 if a petition for review is filed in the Supreme Court of Texas, and an additional $15,000 if the petition for review is granted.  In their nineteenth issue, appellants challenge the legal sufficiency of the evidence to support these findings regarding appellate attorney’s fees.  Appellants contend, and the Walkers concede, that the Walkers did not offer any evidence at trial regarding appellate attorney’s fees. Where, as here, the jury is the factfinder, there must be competent evidence in the record to support appellate attorney’s fees.
(footnote: 63)  The Walkers  argue that, in rendering judgment for appellate attorney’s fees, the trial court was authorized under Section 38.004 of the Texas Civil Practices and Remedies Code to take judicial notice of the usual and customary appellate attorney’s fees and the contents of the case file without receiving any evidence regarding fees.  We disagree.  Section 38.004 applies only to proceedings “before the court” or to jury trials “in which the amount of attorney’s fees is submitted to the court by agreement.”
(footnote: 64)  Neither situation is present here.  Accordingly, because there is no evidence regarding appellate attorney’s fees, we hold that the evidence is legally insufficient to support the award of appellate attorney’s fees.
(footnote: 65)  We sustain appellant’s nineteenth issue.

VI. Appellants’ Declaratory Judgment Claim

In issues twenty-two through twenty-four appellants complain about the trial court’s judgment on their counterclaim for declaratory judgment.  

Appellants first contend that the trial court erred by not rendering a declaratory judgment that the Walkers had failed to comply with the Covenants.  The trial court, however, did render a judgment declaring that the Walkers had failed to comply with three Covenants.  We, therefore, overrule issue twenty-two.

 In their twenty-third issue, appellants challenge the sufficiency of the evidence to support the jury’s finding that Rischon did not suffer any damages as a result of the Walkers’ failure to comply with the three Covenants.  The evidence regarding Rischon’s damages is as follows:

Hawkins testified that, around September 1, 2001, Pulte had made an initial offer to purchase the thirty-one remaining lots in the Sapphire Enclave for $3,100,000 but that Pulte had ultimately paid only $2,300,000 for the lots in early 2002.  Hawkins opined that the “bad condition” of the Walkers’ unfinished home and its negative effect on the market contributed to between 25 and 40% of the reduction in price.

Donald Dykstra, Pulte’s president, testified that the partial construction of the Walkers home detracted “somewhat” from the appearance of the Sapphire Enclave.  Dykstra further testified, however, that nothing the Walkers did influenced Pulte’s decision to purchase the lots or the price that Pulte paid for them.  Dykstra testified that the sales price was “completely independent of the house or the restrictions” and that the unfinished state of construction on the house “wasn’t a positive factor on the subdivision, but it wasn’t an overriding concern either.”  In addition, McLemore testified that, in her opinion as a real estate sales agent, the Walkers’ unfinished house did not negatively affect the value of the adjoining lots.  She explained that the home was “very impressive from the front” and “certainly an indication of what we had hoped the whole area was going to be.”

Having considered all of the evidence, we hold that it is legally and factually sufficient to support the jury’s finding that Rischon did not suffer any damages as a result of the Walkers’ failure to comply with the three Covenants.
(footnote: 66)  Although the evidence is conflicting, the jury was free to believe Dykstra and McLemore and disbelieve Hawkins.
(footnote: 67)  Accordingly, we overrule appellants’ twenty-third issue.

In their twenty-fourth issue, appellants challenge the sufficiency of the evidence to support the jury’s finding of no reasonable attorney’s fees on appellants’ counterclaim for declaratory judgment.  Appellants contend that, because Rischon proved its attorney’s fees on its counterclaim by uncontroverted evidence, Rischon is entitled to recover those fees.  We disagree.

Rischon sought attorney’s fees under both section 37.009 of the declaratory judgments act and section 5.006 of the property code.  In a declaratory judgment proceeding, the decision whether to award attorney’s fees lies with the trial court.
(footnote: 68)  This determination is within the trial court’s sound discretion, and the trial court’s judgment will not be reversed on appeal absent a clear showing that the court abused its discretion.
(footnote: 69)  A trial court abuses its discretion only when it acts arbitrarily or capriciously, without reference to any guiding rules or principles.
(footnote: 70)
 Here, Rischon did put on evidence of its attorney’s fees; however, in light of the jury’s finding that the Walkers violated only three of the eight Covenants sued upon, which appellants do not challenge, and the jury’s finding that Rischon did not suffer any damages as a result, which is supported by legally and factually sufficient evidence, we hold that the trial court did not abuse its discretion by failing to award Rischon attorney’s fees under section 37.009.
(footnote: 71)
 Property code section 5.006 provides, “In an action based on breach of a restrictive covenant pertaining to real property, the court shall allow to a prevailing party who asserted the action reasonable attorney’s fees in addition to the party’s costs and claim.”
(footnote: 72)  The statute does not define “prevailing party”; however, courts have construed this phrase to mean that the party must recover at least some of the relief sought by its claim.
(footnote: 73)  In light of the jury’s finding that Rischon should not recover anything on its claim against the Walkers, we hold that the trial court properly concluded that Rischon was not a prevailing party entitled to recover damages under section 5.006.

For all of these reasons, we overrule appellants’ twenty-fourth issue.

VII. Appellants’ Appeal from the Denial of Their Motion to Recuse

In a separately filed appeal, appellants complain of Judge Walker’s order denying their motion to recuse Judge Evans from the pending post-judgment supersedeas proceedings and of Judge Walker’s related sanctions order.

An order denying a motion to recuse is an unappealable interlocutory order.
(footnote: 74)  Specifically, rule 18a of the Texas Rules of Civil Procedure provides that an order denying a motion to recuse may be reviewed only “on appeal from the final judgment.”
(footnote: 75)  The rule does not address the appealability of an order denying a motion to recuse that is filed after an appeal is taken from a final judgment.

Appellants contend that their appeal from the order denying the motion to recuse Judge Evans from the post-judgment supersedeas proceedings is allowed under rule 18a because appellants have also appealed the trial court’s final judgment.  Appellants’ motion to recuse, however, does not complain of Judge Evans’s participation in any pre-appeal trial court proceedings affecting the final judgment.  Instead, the motion seeks to recuse Judge Evans from participating in post-judgment supersedeas proceedings based on conduct at the October 2006 supersedeas hearing that occurred after the appeal from the final judgment was filed.  Therefore, while appellants have appealed the order denying the motion to recuse during the pendency of the appeal from the final judgment, the order is not reviewable “on appeal from the final judgment” because it had no effect on the final judgment and was entered after the appeal from the final judgment was filed.
(footnote: 76) 

Further, appellants are not seeking to have the order reviewed on appeal from a post-judgment order entered by Judge Evans.  The supersedeas issue remains pending before the trial court.  Judge Evans has taken no action under appellate rule 24.3(a) to modify the amount or type of security or to decide the sufficiency of the sureties, and no party has contended that he has abused his discretion under rule 24.3(a).
(footnote: 77)  Absent such a ruling by Judge Evans, appellants have no basis to complain that Judge Walker’s denial of their motion to recuse has caused them prejudice.
(footnote: 78)
 We hold that the post-judgment order denying appellants’ motion to recuse may be reviewed by this court only upon the filing of a motion under appellate rule 24.4 complaining of the trial court’s exercise of its discretion under rule 24.3(a).  Because Judge Walker’s order denying appellants’ motion to recuse is an unappealable interlocutory order and appellants have not brought a complaint under appellate rule 24.4 challenging Judge Evans’s exercise of his discretion under rule 24.3(a), we have no jurisdiction to review Judge Walker’s order.
(footnote: 79)
VIII.  Appellate Sanctions

In a cross-point, the Walkers argue that appellants’ appeal of the order denying their motion to recuse is frivolous, and they seek damages under appellate rule 45.
(footnote: 80)  We must exercise our discretion to impose rule 45 damages with prudence, caution, and only after careful consideration.
(footnote: 81)  
Rule 45 damages will not be imposed unless the record, viewed from the appellant’s point of view at the time the appeal was taken, clearly shows that the appeal was brought only for delay and that the appellant had no reasonable expectation of reversal.
(footnote: 82)
 Because we have determined that we have no jurisdiction to review the order denying appellants’ motion to recuse, we have not reached the merits of appellants’ complaints regarding the order and express no opinion regarding same.  Accordingly, we deny the Walkers’ request for sanctions.

IX. Conclusion

Having sustained appellants’ first and nineteenth issues, we reverse the trial court’s judgment for the Walkers on their claim brought under section 202.004 of the property code and render judgment that the Walkers take nothing on that claim.
(footnote: 83)  We also reverse the trial court’s award of appellate attorney’s fees and render judgment that the Walkers recover no appellate attorney’s fees from appellants.  We affirm the remainder of the trial court’s August 2005 judgment and dismiss for want of jurisdiction appellants’ separately filed appeal from the order denying their motion to recuse.

JOHN CAYCE

CHIEF JUSTICE

PANEL A:  CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED:  July 5, 2007

FOOTNOTES
1:
For simplicity, in this opinion we refer to these restrictions and covenants as the Covenants.

2:
The Walkers also sued other individuals and entities who are not parties to this appeal. 

3:
The jury found that the Walkers had improperly used wood siding and noncompliant doors and shutters on their house.

4:
See
 
Tex. R. App. P.
 24.2(c)(2).

5:
See
 
Tex. R. Civ. P.
 18a(c)–(d) (setting out procedure for same).

6:
See
 
Tex. R. App. P.
 24.3(a) (providing that, after the trial court’s plenary power expires, it has continuing jurisdiction to order the amount and type of security, to decide the sufficiency of sureties, and to modify the amount or type of security).

7:
Tex. Prop. Code Ann.
 § 202.004(b) (Vernon 2007).

8:
Id.
 § 202.001(2).

9:
Id.
 § 202.004(c).

10:
Wal-Mart Stores, Inc. v. McKenzie,
 
997 S.W.2d 278, 280 (Tex. 1999)
.
 

11:
Cont’l Cas. Co. v. Downs,
 81 S.W.3d 803, 805 (Tex. 2002); 
Nat’l Liab. & Fire Ins. Co. v. Allen,
 15 S.W.3d 525, 527 (Tex. 2000).

12:
The parties do not assert that section 202.004 is ambiguous.

13:
Downs,
 81 S.W.3d at 805; 
see
 
Tex. Gov’t Code Ann.
 § 311.011(a) (Vernon 2005) (“Words and phrases shall be read in context and construed according to the rules of grammar and common usage.”); 
id.
 § 312.002(a) (providing that words shall be given their ordinary meaning).

14:
C & H Nationwide, Inc. v. Thompson,
 903 S.W.2d 315, 322 n.5 (Tex. 1994), 
abrogated on other grounds, Battaglia v. Alexander,
 177 S.W.3d 893 (Tex. 2005)
; 
Sharp v. House of Lloyd, Inc.,
 815 S.W.2d 245, 249 (Tex. 1991).

15:
Helena Chem. Co. v. Wilkins,
 47 S.W.3d 486, 493 (Tex. 2001).

16:
Tex. Prop. Code Ann.
 §§ 202.001(1), 202.004(b).

17:
See Quinn v. Harris,
 No. 03-98-00117-CV, 1999 WL 125470, at *7-8 (Tex. App.—Austin March 11, 1999, pet. denied) (not designated for publication) (holding same).

18:
See, e.g., Anderson v. New Prop. Owners’ Ass’n of Newport, Inc.,
 122 S.W.3d 378, 388 (Tex. App.—Texarkana 2003, pet. denied) (holding that an association designated by a subdivision owner as the owner’s representative could sue under 202.004 on the owner’s behalf); 
Musgrave v. Brookhaven Lake Prop. Owners Ass’n,
 990 S.W.2d 386, 394  (Tex. App.—Texarkana 1999, pet. denied) (holding that a voluntary homeowners’ association, which property owners had designated as their representative by a show of hands, could sue under section 202.004).

19:
In light of our holding with regard to appellants’ first issue, we need not consider their second through fifth, eighteenth, twenty-first, and twenty-fifth through twenty-eighth issues.  
See
 
Tex. R. App. P.
 47.1 (providing that a court of appeals need address only issues raised that are necessary to the final disposition of the appeal).

20:
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.

21:
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005).

22:
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).
 

23:
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).

24:
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965). 

25:
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

26:
Tex. Bus. & Com. Code Ann.
 § 27.01(a)(2) (Vernon 2002).

27:
Id.
 § 27.01(b)–(c).

28:
Spoljaric v. Percival Tours, Inc.,
 708 S.W.2d 432, 434 (Tex. 1986); 
IKON Office Solutions, Inc. v. Eifert,
 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  

29:
Schindler v. Austwell Farmers Co-op.,
 841 S.W.2d 853, 854 (Tex. 1992); 
Spoljaric,
 708 S.W.2d at 435.

30:
Schindler,
 841 S.W.2d at 854; 
Spoljaric,
 708 S.W.2d at 435.

31:
Spoljaric,
 708 S.W.2d at 434.

32:
Id.
 at 435.

33:
Transport Ins. Co. v. Faircloth,
 898 S.W.2d 269, 276 (Tex. 1995).

34:
Id.

35:
Id.

36:
Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,
 51 S.W.3d 573, 578-79 (Tex. 2001).

37:
Id.
 at 578, 581; 
see
 
Westcliff Co. v. Wall,
 153 Tex. 271, 267 S.W.2d 544, 546 (1954) (holding that there was no evidence of the defendant’s intent to defraud a third party because the defendant did not know when he made the misrepresentations in the third party’s presence that the third party was interested in purchasing the property).

38:
Formosa Plastics Corp. USA  v. Presidio Eng’rs and Contractors, Inc.,
 960 S.W.2d 41, 49 (Tex. 1998); 
Arthur Andersen & Co. v. Perry Equip. Corp.,
 945 S.W.2d 812, 817 (Tex. 1997).

39:
Formosa Plastics Corp.,
 960 S.W.2d at 49; 
Arthur Andersen & Co.,
 945 S.W.2d at 817.

40:
Arthur Andersen & Co.,
 945 S.W.2d at 817.

41:
Trenholm v. Ratcliff,
 646 S.W.2d 927, 933 (Tex. 1983); 
Bruce v. Jim Walters Homes, Inc.,
 943 S.W.2d 121, 123 (Tex. App.—San Antonio 1997, writ denied); 
Airborne Freight Corp. v. C.R. Lee Enters., Inc.,
 847 S.W.2d 289, 295 (Tex. App.—El Paso 1992, writ denied).

42:
Hawkins testified that he and McLemore had never met or spoken to one another before trial and that this testimony was untrue.  As the trier of fact, however, the jury was free to believe McLemore’s testimony and disbelieve Hawkins’s.  
See McGalliard v. Kuhlmann,
 722 S.W.2d 694, 697 (Tex. 1986) (holding that, when presented with conflicting evidence, the trier of fact may believe one witness and disbelieve others).

43:
Appellants’ argument that Hawkins’s representation regarding building a perimeter fence was not false because Pulte built the fence is without merit.  Ron testified that Hawkins represented that appellants, not another developer, would have the fence built and that construction on the fence would begin immediately after the Walkers closed on their lot. 

44:
Ron Walker testified that the home the Walkers planned to build was “[i]n the 800 range.”  John Marin, the certified real estate appraiser who prepared the preconstruction appraisal for the Walkers’ home, testified that he had prepared the appraisal using the cost approach and the direct sales comparison approach and had calculated that the value of the home upon completion would be $896,600. 

45:
Marin testified that his preconstruction appraised value of $896,600 was calculated with the expectation that the house would be built as originally planned, not with the substitutions of materials that later occurred.

46:
Trenholm,
 646 S.W.2d at 933.  Appellants suggest that, because the Walkers contracted in February 2001 (i.e., before they purchased their lot) to purchase their home from Ron Walker’s corporation for $585,000, that contract price is evidence that appellants are not liable to the Walkers for any amount over $585,000 that the Walkers spent to complete their home.  But the February 2001 contract was not admitted into evidence to establish the value of the home.  Ron Walker testified that the Walkers executed the contract as a formality so that they could obtain title to the property and close on their construction loan.  Further, the jury was free to resolve conflicts between this evidence and Ron’s, McLemore’s, and Marin’s testimony regarding the value of the completed home.  
See McGalliard,
 722 S.W.2d at 697.

47:
Because we have held that the evidence is legally and factually sufficient to support the jury’s liability and damages findings on the Walkers’ statutory fraud claim, and that those findings support the trial court’s judgment for $242,199 in actual damages, we need not consider appellants’ ninth, eleventh, and fifteenth  issues, in which they challenge the sufficiency of the evidence to support the jury’s liability and damages findings on the Walkers’ negligent misrepresentations claim.  
See
 
Tex. R. App. P.
 47.1 (providing that a court of appeals need consider only issues raised that are necessary to the final disposition of the appeal).  Similarly, we also overrule appellant’s sixteenth and seventeenth issues challenging the award for exemplary damages and attorney’s fees based on the argument that there is insufficient evidence to support the statutory fraud findings.

48:
See, e.g.,
 
Tex. Bus. & Com. Code Ann.
 § 26.01(a), (b)(4) (Vernon Supp. 2006) (providing that a promise or agreement in a contract for the sale of real estate is not enforceable unless it is in writing and signed by the party to be charged).

49:
Sonnichsen v. Baylor Univ.,
 47 S.W.3d 122, 127 (Tex. App.—Waco 2001, no pet.); 
Leach v. Conoco, Inc.,
 892 S.W.2d 954, 960 (Tex. App.—Houston [1st Dist.] 1995, writ dism’d w.o.j.)

50:
See Sanchez v. Johnson & Johnson Med., Inc.,
 860 S.W.2d 503, 513-14 & n.4 (Tex. App.—El Paso 1993) (noting that expectation damages are benefit-of-the-bargain damages), 
aff’d in part and rev’d in part on other grounds,
 924 S.W.2d 925 (Tex. 1996); 
Nance v. Resolution Trust Corp.,
 803 S.W.2d 323, 330 n.3 (Tex. App.—San Antonio 1990) (same), 
writ denied,
 813 S.W.2d 154 (Tex. 1991).  
Collins v. Allied Pharmacy Mgmt., Inc.,
 871 S.W.2d 929, 936 (Tex. App.—Houston [14th Dist.] 1994, no writ), on which appellants rely, is inapposite.  In that case, the plaintiffs sought by their fraud claim to enforce alleged provisions in their employment agreements.  
See id.

51:
See
 
Tex. Bus. & Com. Code Ann.
 § 27.01(e).  Appellants’ complaint that the Walkers cannot recover attorney’s fees on this claim is waived because appellants did not raise it in the trial court.  
See
 
Tex. R. App. P.
 33.1(a).  Indeed, in their motion for new trial, appellants acknowledged that the Walkers could recover attorney’s fees for statutory fraud. 

52:
Stewart Title Guar. Co. v. Sterling,
 822 S.W.2d 1, 10 (Tex. 1991), 
modified on other grounds by
 
Tony Gullo Motors I, L.P. v. Chapa,
 212 S.W.3d 299 (Tex. 2006).

53:
Arthur Andersen & Co.,
 945 S.W.2d at 818.

54:
Hagedorn v. Tisdale,
 73 S.W.3d 341, 353 (Tex. App.—Amarillo 2002, no pet.).

55:
Id.

56:
Liberty Mut. Ins. Co. v. Allen,
 669 S.W.2d 750, 755 (Tex. App.—Houston [1st Dist.] 1983, writ ref’d n.r.e.).

57:
Miskin testified that he had been licensed in Texas for twenty-three years, had maintained a certification in residential real estate law for fifteen years, had taught real estate law at the University of Texas at Arlington and lectured to the legal community on real estate issues, and that 90 to 95 percent of his practice involved real estate and commercial litigation.

58:
Miskin testified that he had charged this hourly rate to one major client for the past four-and-a-half years.

59:
See Ragsdale v. Progressive Voters League,
 801 S.W.2d 880, 882 (Tex. 1990) (holding that, where the testimony of an interested witness is clear, positive and direct, and uncontradicted by any other witness, attendant circumstances, or inaccuracies, it may be taken as true—especially where the opposing party had the means and opportunity of disproving the testimony but failed to do so); 
see also City of Keller
, 
168 S.W.3d at 827 (holding that, in conducting a legal 
sufficiency review, we must consider evidence favorable to the finding if a reasonable factfinder could).

60:
Tony Gullo Motors I, L.P.,
 212 S.W.3d at 313-14.

61:
See
 
Matthews v. Candlewood Builders, Inc.,
 685 S.W.2d 649, 650 (Tex. 1985) (holding that the defendant must request a jury issue separately allocating fees for each fee-bearing claim in order to complain on appeal of fees not associated with the plaintiff’s successful claim). 

62:
See Osterberg v. Peca,
 12 S.W.3d 31, 55 (Tex.) (“[I]f the trial court has ‘to resolve a legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial.’”) (quoting 
Holland v. Wal-Mart Stores, Inc.,
 1 S.W.3d 91, 94 (Tex. 1999)), 
cert. denied,
 530 U.S. 1244 (2000).

63:
Great Am. Reserve Ins. Co. v. Britton,
 406 S.W.2d 901, 907 (Tex. 1966); 
see Aiello,
 941 S.W.2d at 73 (holding that, when a case is tried to a jury, “[t]he award of appellate fees is a question of fact for the jury”).

64:
Tex. Civ. Prac. & Rem. Code Ann.
 § 38.004 (Vernon 1997); 
See
 
Main Place Custom Homes, Inc. v. Honaker,
 192 S.W.3d 604, 622 (Tex. App.—Fort Worth 2006, pet. denied); 
Lefton v. Griffith,
 136 S.W.3d 271, 279-80 (Tex. App.—San Antonio 2004, no pet.).

65:
See
 
Uniroyal Goodrich Tire Co.
, 977 S.W.2d at 334
 (holding that 
a legal sufficiency challenge must be sustained when the record discloses a complete absence of evidence of a vital fact).

66:
See id.
 (setting out legal sufficiency standard of review); 
Garza,
 395 S.W.2d at 823 (setting out factual sufficiency standard of review).

67:
See McGalliard,
 722 S.W.2d at 697.

68:
See 
Tex. Civ. Prac. & Rem. Code Ann.
 § 37.009 (Vernon 1997) (“In a proceeding under this chapter, the court may award costs and reasonable and necessary attorney’s fees as are equitable and just.”).

69:
Bocquet v. Herring,
 972 S.W.2d 19, 21 (Tex. 1998); 
Cotten v. Weatherford Bancshares, Inc.,
 187 S.W.3d 687, 709 (Tex. App.—Fort Worth 2006, pet. denied).

70:
Downer v. Acquamarine Operators, Inc.,
 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied,
 476 U.S. 1159 (1986).

71:
See Brazoria County v. Tex. Comm’n on Envtl. Quality,
 128 S.W.3d 728, 744 (Tex. App.—Austin 2004, no pet.) (holding that the trial court did not abuse its discretion by refusing to award attorney’s fees to the nonprevailing party in a declaratory judgment case); 
Parts Indus. Corp. v. A.V.A. Servs., Inc.,
 104 S.W.3d 671, 685  (Tex. App.—Corpus Christi 2003, no pet.) (holding that trial court did not abuse its discretion by refusing to award attorney’s fees to the prevailing party in a declaratory judgment case).

72:
Tex. Prop. Code Ann.
 § 5.006(a) (Vernon 2004).

73:
See, e.g., 
Jim Rutherford Inv., Inc. v. Terramar Beach Comty. Ass’n,
 25 S.W.3d 845, 853 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding that plaintiff was the prevailing party because it had obtained permanent injunctive relief against the defendant); 
Gorman v. Countrywood Prop. Owners Ass’n,
 1 S.W.3d 915, 917  (Tex. App.—Beaumont 1999, pet. denied) (noting that plaintiff that obtained a judgment for delinquent maintenance fees was entitled to recover attorney’s fees); 
Briargrove Park Property Owners, Inc. v. Riner,
 867 S.W.2d 58, 61 (Tex. App.—Texarkana 1993, writ denied) (same); 
City of Houston v. Muse,
 788 S.W.2d 419, 424 (Tex. App.—Houston [1st
 Dist.] 1990, no writ) (injunctive relief); 
Hanchett v. E. Sunnyside Civic League,
 696 S.W.2d 613, 615 (Tex. App.—Houston [14th Dist.] 1985, writ ref’d n.r.e.) (trial court entered order requiring property owner to remove his noncompliant house from his lot); 
Finkelstein v. Southampton Civic Club,
 675 S.W.2d 271, 273 (Tex. App.—Houston [1st Dist.] 1984, writ ref’d n.r.e.) (injunctive relief); 
Inwood N. Homeowners’ Ass’n v. Meier,
 625 S.W.2d 742, 743-44 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ) (same); 
Rankin v. Covington Oaks Condo. Owners Ass’n,
 No. 04-04-00861-CV, 2005 WL 3161039, at *1, 5 (Tex. App.—San Antonio Nov. 23, 2005, no pet.) (mem. op.) (plaintiffs obtained a declaratory judgment that they were entitled to make the changes to their homes that the homeowners’ association had arbitrarily denied).

74:
In re Estate of Trevino,
 195 S.W.3d 223, 226 (Tex. App.—San Antonio 2006, no pet.) (op. on reh’g); 
see Lehmann v. Har-Con Corp.,
 39 S.W.3d 191, 195 & n.12 (Tex. 2001) (noting the well-settled rule that appellate courts can review only final judgments and interlocutory orders specifically made appealable by statute).

75:
Tex. R. Civ. P.
 18a(f); 
In re Union Pac. Res. Co.,
 969 S.W.2d 427, 428 (Tex. 1998) (orig. proceeding).  The rationale for this rule is that the erroneous denial of a recusal motion is not fundamental error and does not void or nullify the trial judge’s subsequent acts.  
Union Pac. Res. Co.
, 969 S.W.2d at 428.  Thus, if the appellate court determines that the trial judge should have been recused, the appellate court can reverse the trial court’s judgment and remand for a new trial before a different judge.  
Id.

76:
Appellants’ reliance on 
Sun Exploration & Prod. Co. v. Jackson,
 783 S.W.2d 202, 206 (Tex. 1989), 
Martin v. State,
 876 S.W.2d 396, 397 (Tex. App.—Fort Worth 1994, no writ), and 
Keene Corp. v. Rogers,
 863 S.W.2d 168, 171 (Tex. App.—Texarkana 1993, no writ) is misplaced.  Those cases are inapposite because they pertain only to the deadline for filing a motion to recuse that complains of trial court proceedings affecting the final judgment.

77:
Tex. R. App. P.
 24.3; 
see
 
Tex. R. App. P.
 24.4 (providing that the appellate court may review these matters on a party’s motion).

78:
See
 
Tex. R. App. P.
 44.1(a) (providing that no judgment may be reversed based on trial court error unless the error probably caused the rendition of an improper judgment or prevented the appellant from properly presenting its case on appeal); 
cf. Liljeberg v. Health Servs. Acquisition Corp.,
 486 U.S. 847, 862, 108 S. Ct. 2194, 2203 (1988) (holding that a trial judge’s failure to disqualify himself under 28 U.S.C. § 455 is subject to a harm analysis); 
In re Continental Airlines Corp.,
 901 F.2d 1259, 1263 (5th Cir. 1990) (same), 
cert. denied,
 506 U.S. 828 (1992).

79:
In the alternative, appellants ask us to treat their appeal as a petition for writ of mandamus.  It is well settled, however, that mandamus is an improper vehicle for challenging an order denying a motion to recuse because there is an adequate remedy for reviewing the denial of a motion to recuse on appeal. 
Union Pac. Res. Co.,
 969 S.W.2d at 428; 
accord In re Norman,
 191 S.W.3d 858, 860 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding); 
In re Lutz,
 164 S.W.3d 721, 723-24 (Tex. App.—El Paso 2005, orig. proceeding); 
In re Lincoln,
 114 S.W.3d 724, 726 (Tex. App.—Austin 2003, orig. proceeding).  When, and if, the trial court exercises its discretion under appellate rule 24.3(a), appellants have an adequate remedy for reviewing the order denying their motion to recuse; therefore, a petition for writ of mandamus would be improper.

80:
See
 
Tex. R. App. P.
 45.

81:
Duran v. Resdoor Co., 
977 S.W.2d 690, 693 (Tex. App.—Fort Worth 1998, pet. denied); 
Deaner v. Marchese,
 No. 02-03-00029-CV, 2004 WL 177480, at *1 (Tex. App.—Fort Worth Jan. 29, 2004, no pet.) (mem. op.).

82:
Smith v. Brown, 
51 S.W.3d 376, 381 (Tex. App.—Houston [1st
 Dist.] 2001, pet. denied); 
Duran, 
977 S.W.2d at 693; 
Bledsoe v. Kuczek,
 No. 02-02-00255-CV, 2003 WL 21476204, at *4 (Tex. App.—Fort Worth June 26, 2003, no pet.).

83:
The trial court awarded appellants a $45,000 settlement credit against the Walkers’ statutory damages for improper revocation of the Covenants under section 202.004.  Appellants do not argue on appeal that the settlement credit should be offset against the Walkers’ damages for statutory fraud.  Therefore, we do not apply the settlement credit to that damages award.